******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

COMMISSION ON HUMAN RIGHTS AND
OPPORTUNITIES *v.* RICHARD
CANTILLON ET AL.
(AC 43534)

Alvord, Alexander and Vertefeuille, Js.

*Syllabus*

The defendant H filed a complaint with the plaintiff Commission on Human
Rights and Opportunities alleging discrimination in housing because of
race against the defendant C, her neighbor in a condominium complex.
C was defaulted in the underlying administrative proceeding. At the
hearing in damages, the plaintiff commission requested $75,000 in com-
pensatory damages. The human rights referee of the defendant Commis-
sion on Human Rights and Opportunities awarded H, inter alia, $15,000 in
compensatory damages for emotional distress. The plaintiff commission
filed a request for the referee to reconsider her decision, which request
was deemed denied after the referee failed to take further action. The
plaintiff commission then appealed the referee's decision, claiming, pri-
marily, that the damages awarded were insufficient. The trial court
remanded the matter for further consideration of damages in light of
the Supreme Court's decision in *Patino* v. *Birken Mfg. Co.* (304 Conn.
679). On remand, the referee issued a final decision that did not change
the amount of the damages awarded. The administrative appeal was
then argued before the trial court, which rendered judgment dismissing
the appeal and affirming the referee's decision. On the plaintiff commis-
sion's appeal to this court, *held* that the referee did not act unreasonably
or arbitrarily in her decision and the trial court did not abuse its discre-
tion in dismissing the plaintiff commission's appeal and affirming the
referee's decision: neither the referee nor the trial court misinterpreted
or misapplied *Patino* in the determination of emotional distress dam-
ages, as *Patino* did not establish a presumptive or mandatory range of
damages for emotional distress claims but merely addressed a general
range that such claims typically merit, references to that range in other
cases did not establish any binding principle pertaining to damage
awards in emotional distress actions, the fact that the emotional distress
damage award fell outside of that general range did not, by itself, create
a presumption of error, and, although it might have been instructive or
persuasive for the referee to consider damage awards and decisions
outside of the state, there was no legal mandate requiring her to do so;
moreover, neither the referee nor the trial court misapplied the factors
set forth in *Commission on Human Rights & Opportunities ex rel.
Harrison* v. *Greco* (CHRO No. 7930433) in the calculation of emotional
distress damages, as the referee did not act unreasonably in considering
the relationship between H and C because the nature of that relationship
was highly relevant to the degree of offensiveness and to the impact
the infliction of emotional distress had on H, H and C did not share a
power dynamic similar to that of a landlord and tenant because, as her
neighbor, C did not have any enforcement or supervisory power over
H and he lacked the ability to oppress or penalize her, the referee's
conclusion that the discrimination was not public was a reasonable
factual finding in light of the evidence before her and this court declined
to disturb it, and, in discussing the public nature of C's conduct and his
intentions relating to the same, the referee did not impose an additional
requirement without a legal basis but, rather, considered C's intentions
as a means to analyze the circumstances surrounding the harassment
and its effect on H.

Argued March 2—officially released September 21, 2021

*Procedural History*

Appeal from the decision by a human rights referee
for the defendant Commission on Human Rights and
Opportunities, inter alia, declining to increase the

amount of damages awarded to the defendant Kelly Howard in an action alleging discrimination in housing against the named defendant, brought to the Superior Court in the judicial district of New Britain, where the court, *Cordani, J.*, rendered judgment dismissing the appeal, from which the plaintiff appealed to this court. *Affirmed.*

*Michael E. Roberts*, human rights attorney, for the plaintiff (appellant).

*Charles Krich*, principal attorney, for the appellee (defendant Commission on Human Rights and Opportunities).

*William Tong*, attorney general, *Clare E. Kindall*, solicitor general, and *Colleen B. Valentine* and *Matthew F. Larock*, assistant attorneys general, filed a brief for the state of Connecticut as amicus curiae.

*Opinion*

ALEXANDER, J. The plaintiff, the Commission on Human Rights and Opportunities (plaintiff commission), appeals from the judgment of the Superior Court dismissing its administrative appeal from the final decision of the defendant Commission on Human Rights and Opportunities (defendant commission).[1] On appeal, the plaintiff commission argues that the Superior Court erred in dismissing its administrative appeal because the human rights referee (referee) and the Superior Court (1) misinterpreted and misapplied *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 41 A.3d 1013 (2012), in the calculation of emotional distress damages, and (2) misapplied the factors set forth in *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, CHRO No. 7930433 (June 3, 1985) pp. 7–8, in the determination of emotional distress damages. We are unpersuaded and, accordingly, affirm the judgment of the Superior Court.

The following facts, as found by the Superior Court, and procedural history are relevant to our resolution of this appeal. "On June 8, 2015, Kelly Howard . . . filed a complaint with the [Commission on Human Rights and Opportunities (CHRO)] against Richard Cantillon . . . her neighbor, alleging discrimination in housing because of race in violation of General Statutes §§ 46a-58 (a) and 46a-64c. [Specifically, Howard alleged that she was subjected to verbal and physical harassment in the form of racial slurs, including use of the N-word, obscene gestures and threats of physical harm, by Cantillon at the condominium complex where they both resided.] The CHRO took up the matter. [Cantillon] was defaulted in the underlying administrative proceeding, and a hearing in damages was held. At the hearing in damages, the CHRO requested $75,000 in compensatory damages. The [referee] awarded $15,000 in compensatory damages for emotional distress and $157.15 in compensatory damages for out-of-pocket travel expenses. The [referee] also awarded postjudgment interest at 10 percent per year, and entered cease and desist, as well as nonretaliation orders. The CHRO filed a request for the [referee] to reconsider her decision, but the [referee] took no action, and the request was deemed denied. The CHRO timely appealed the decision of its own [referee], complaining primarily that the damages awarded were insufficient. On February 7, 2018, [the Superior Court] remanded the matter for further consideration of damages in light of the Supreme Court's decision in *Patino* v. *Birken Mfg. Co.*, [supra, 304 Conn. 679]. Upon remand, the [referee] issued a final decision, but did not change the damages award." (Footnote omitted.) The administrative appeal subsequently was briefed and argued before the Superior Court. On October 2, 2019, the Superior Court rendered a judgment and accompanying memorandum of law dismissing the

appeal and affirming the referee's decision. This appeal followed. Additional facts will be set forth as necessary.

We begin our analysis by setting forth our standard of review. The plaintiff commission appeals from the judgment of the Superior Court dismissing its administrative appeal and affirming the decision of the referee. "It is well established that [j]udicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act [(UAPA) General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, 298 Conn. 703, 716, 6 A.3d 763 (2010). "Even for conclusions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . [Thus] [c]onclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts." (Internal quotation marks omitted.) *Chairperson, Connecticut Medical Examining Board* v. *Freedom of Information Commission*, 310 Conn. 276, 281, 77 A.3d 121 (2013).

In the present case, both parties ask us to reverse the referee's award of damages and the Superior Court's affirmance thereof. Specifically, both parties claim that the referee misapplied *Patino* and the *Harrison* factors in its determination of damages. We note that both the plaintiff commission and the defendant commission argue that they have raised pure questions of law such that we must exercise our plenary review over their claims. We disagree with this assertion. The present case does not present a pure question of law because it requires the review of the referee's award of damages, which constitutes a question of fact. See *Westport Taxi Service, Inc.* v. *Westport Transit District*, 235 Conn. 1, 28, 664 A.2d 719 (1995). Accordingly, "the factual and discretionary determinations of administrative agencies are to be given considerable weight by the courts [and] . . . it is for the courts, and not for administrative agencies, to expound and apply governing principles of law." (Internal quotation marks omitted.) *Board of Education* v. *Freedom of Information Commission*, 217 Conn. 153, 159, 585 A.2d 82 (1991); see also General Statutes § 4-183 (j). We iterate that we cannot substitute our judgment for that of the referee and our ultimate duty is to decide only if the referee "acted unreasonably, arbitrarily, illegally, or in abuse of [her] discretion" and that any conclusion of law must stand if we determine that it "resulted from a correct application of the law to the facts found . . . ." (Internal quotation marks

omitted.) *Meriden* v. *Freedom of Information Commission*, Conn. , , A.3d (2021).

## I

The plaintiff commission first argues that the referee and the Superior Court misinterpreted and misapplied *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 679, in the calculation of emotional distress damages. The plaintiff commission contends that *Patino* stands for the proposition that in "garden variety" emotional distress claims, there is a presumptive monetary range of damages between $30,000 and $125,000. See id., 708. The plaintiff commission argues that, because the referee did not "consider analogous decisions from neighboring tribunals" and the damage award in the present case fell below this range, the referee committed an "error of law." The defendant commission argues similarly. We disagree with the parties' interpretation of *Patino*.

An analysis of *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 679, will facilitate our review of the parties' arguments. In *Patino*, the central issue on appeal was "whether General Statutes § 46a-81c (1) imposes liability on employers for failing to take reasonable steps to prevent their employees from being subjected to hostile work environments based on their sexual orientation." (Footnote omitted.) Id., 682. Our Supreme Court determined that it did and concluded that the phrase " 'terms, conditions or privileges of employment' constitutes a term of art with a fixed legal meaning" and the use of that phrase in § 46a-81c (1) evidenced the legislature's intent to permit hostile work environment claims under the statute. Id., 697.

A tertiary claim on appeal was whether "the trial court, in denying the motion to set aside the verdict and the motion for remittitur, abused its discretion by concluding that the $94,500 noneconomic damages award was supported by the evidence and was not excessive." Id., 705. In its analysis of this claim, our Supreme Court concluded that, "given the sustained nature of the discrimination described by the plaintiff, the severity of the hostility he experienced, and the continued failure of the defendant to remedy the situation, the trial court did not abuse its discretion when it concluded that the award was not excessive or shocking when compared to verdicts awarded under similar circumstances. See, e.g., *Gonzalez* v. *Bratton*, 147 F. Supp. 2d 180, 208–209 (S.D.N.Y. 2001) ($250,000 compensatory damages award for emotional distress claim under both federal and state law) [aff'd, 48 Fed. Appx. 363 (2d Cir. 2002)]; *Oliver* v. *Cole Gift Centers, Inc.*, 85 F. Supp. 2d 109, 114–15 (D. Conn. 2000) ($100,000 compensatory damages award in Title VII and Connecticut Fair Employment Practices Act case); *Ikram* v. *Waterbury Board of Education*, United States District Court, Docket No. 3:95CV2478 (AHN), [1997 WL 597111, *4] 1997 U.S. LEXIS 14619 (D. Conn. September 9, 1997)

($100,000 compensatory damages award in Title VII case); *Annis* v. *Westchester*, 939 F. Supp. 1115, 1121–22 (S.D.N.Y. 1996) ($100,000 compensatory damages award based on 42 U.S.C. § 1983 civil rights violation causing plaintiff's emotional suffering) [aff'd in part, vacated and remanded in part, 136 F.3d 239 (2d Cir. 1998)]; *Rush* v. *Scott Specialty Gases, Inc.*, 930 F. Supp. 194, 199 (E.D. Pa. 1996) ($100,000 compensatory damages award based on Title VII claim for plaintiff's emotional distress and depression) [rev'd, 113 F.3d 476 (3d Cir. 1997)]; see also *Olsen* v. *Nassau*, [615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)] ('[*g*]*arden variety emotional distress claims generally merit $30,000 to $125,000 awards*' . . . )." (Emphasis added; footnote omitted.) *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 707–708.

The plaintiff commission argues that, based on this language, "[t]he pertinent lessons of *Patino* . . . are twofold: first, that the general range of garden variety emotional distress damages claims in discrimination cases is ordinarily between $30,000 and $125,000; and second, that a tribunal calculating an award of damages should not only look to its own previous decisions for guidance, but should consider analogous decisions from neighboring tribunals as well. That the referee failed to adhere to these aspects of *Patino* on remand constitutes an error of law."

To support its first assertion concerning a presumptive range of damages, the plaintiff commission focuses on our Supreme Court's citation to *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46, and the statement contained therein that "[g]arden variety emotional distress claims generally merit $30,000 to $125,000 awards." (Internal quotation marks omitted.) See *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 708. The plaintiff commission asserts that this favorable citation to *Olsen* demonstrates a recognition by our Supreme Court that there is a presumptive range of damages to be awarded in so-called garden variety emotional distress claims. We are not persuaded.

A review of *Patino* reveals that the holding pertaining to the damage award was limited and based on the particular factual circumstances of that case. Our Supreme Court concluded that, "the trial court did not abuse its discretion when it concluded that the award was not excessive or shocking when compared to verdicts awarded under *similar circumstances*." (Emphasis added.) Id., 708. Additionally, the language from *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46, cited by our Supreme Court addresses only a *general* range of emotional distress damages as it states simply that "[g]arden variety emotional distress claims *generally* merit $30,000 to $125,000 awards." (Emphasis added; internal quotation marks omitted.) In *Patino*, the Supreme Court did not establish a presumptive or mandatory range of damages. We decline to extend the

language of *Patino* and the cases cited therein to create a presumptive or mandatory range for emotional distress damages.

The plaintiff commission directs us to multiple federal decisions in the United States District Court for the District of Connecticut that, it argues, provide guidance on the strength of the range of damages discussed in *Patino* as a presumptive reference point for an emotional distress damage award. See *State* v. *Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989) ("[w]e have often looked to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute" (internal quotation marks omitted)). Specifically, the plaintiff commission points to *Vera* v. *Alstom Power, Inc.*, 189 F. Supp. 3d 360 (D. Conn. 2016), appeal dismissed, United States Court of Appeals, Docket No. 16-2488 (2d Cir. August 16, 2016), and *Carmichael* v. *Advanced Nursing & Rehabilitation Center of New Haven, LLC*, United States District Court, Docket No. 3:19CV908 (JBA), (D. Conn. February 24, 2021), as persuasive authorities that rely on the principles of *Patino* in analyzing emotional distress damages.

In *Vera* v. *Alstom Power, Inc.*, supra, 189 F. Supp. 3d 379, the District Court, as part of its discussion of similar federal and state cases, cited *Patino* and the language therein that "[g]arden variety emotional distress claims *generally* merit $30,000 to $125,000 awards." (Emphasis added; internal quotation marks omitted.) In *Carmichael* v. *Advanced Nursing & Rehabilitation Center of New Haven, LLC*, supra, United States District Court, Docket No. 3:19CV908 (JBA), the District Court noted in a footnote that its decision to award $70,000 for the plaintiff's "emotional injuries and associated physical impacts" was "consistent with other comparable cases in this [c]ircuit where compensatory damages awards range between $30,000 and $125,000."

Although perhaps instructive, these cursory references to a range of damages in other cases do not persuade us that *Patino* stands for any *binding* principle pertaining to damage awards in emotional distress actions. Contrary to the parties' claims, there is not a binding or presumptive range for emotional distress damages recognized in this state. The claim that emotional distress damage awards appear to fall *generally* within a certain range does not by itself create a presumption of error if an award is outside that range.[2] Rather, "[i]n garden variety emotional distress claims, the evidence of mental suffering is generally limited to the testimony of the plaintiff." (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, supra, 304 Conn. 707, quoting *Olsen* v. *Nassau*, supra, 615 F. Supp. 2d 46.

Further, to the extent that the plaintiff commission

argues that *Patino* holds that a tribunal calculating an award of damages should consider analogous decisions from neighboring jurisdictions in addition to awards granted in this state, we find no support in the language of the case that supports this proposition. In the present case, the referee extensively analyzed the range of awards issued from that office. Although it may be instructive or persuasive for a tribunal to consider damage awards and decisions outside of Connecticut, there is no mandate in law requiring a tribunal to do so in its analysis.

After a thorough review of the record, we find that neither the referee nor the Superior Court misinterpreted or misapplied *Patino*. Accordingly, we conclude that the referee did not act unreasonably or arbitrarily in her decision and that the Superior Court did not abuse its discretion in dismissing the plaintiff commission's appeal and affirming the referee's decision.

II

The plaintiff commission next argues that the referee erred in her interpretation and application of the factors set forth in *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, CHRO No. 7930433, pp. 7–8, to determine emotional distress damages. Specifically, the plaintiff commission argues that the referee erred in considering the relationship between Howard and Cantillon; that the referee erred in concluding that the discrimination was not public; and that the Superior Court erroneously upheld the referee's findings. We are not persuaded.

We begin our analysis with a review of *Harrison*. The complainant in that case, Donna Harrison, filed a complaint with the CHRO alleging discrimination on the basis of race in public accommodations, specifically, rental housing, by the respondent, John Greco. Id., p. 1. In her discussion of the damage award for humiliation and emotional distress, the hearing officer analyzed numerous cases in Connecticut, as well as those from other state and federal jurisdictions, and enumerated a series of factors that other courts and administrative officers had found relevant in their determinations of awards for emotional distress and humiliation. Id., pp. 6–8. The hearing officer, quoting *Commission on Human Rights & Opportunities ex rel. Barboza* v. *Chestnut Realty, Inc.*, CHRO No. 7830126 (April 12, 1983) p. 12, noted that "[t]he most important element of such damages is the subjective internal emotional reaction of the complainant to the discriminatory experience which he has undergone . . . ." (Internal quotation marks omitted.) *Commission on Human Rights & Opportunities ex rel. Harrison* v. *Greco*, supra, CHRO No. 7930433, p. 7. The officer further noted that "[o]ther factors that courts and administrative officers have found relevant in determining the amount to award for emotional distress and humiliation are . . . whether

the discrimination occurred in front of other people . . . [and] the degree of offensiveness of the discrimination and the impact on the [complainant] . . . ." (Citations omitted.) Id., p. 8; see also *Commission on Human Rights & Opportunities* v. *Sullivan Associates*, Docket Nos. CV-94-4031061-S and CV-95-4031060-S, 2011 WL 3211150, *4 (Conn. Super. June 6, 2011) ("Under the *Harrison* analysis, the most important factor of such damages is the subjective internal emotional reaction of the complainants to the discriminatory experience which they have undergone and whether the reaction was intense, prolonged and understandable. . . . Second, is whether the discrimination occurred in front of other people. . . . For this, the court must consider if the discriminatory act was in public and in view or earshot of other persons which would cause a more intense feeling of humiliation and embarrassment. . . . The third and final factor is the degree of the offensiveness of the discrimination and the impact on the complainant. . . . In other words, was the act egregious and was it done with the intention and effect of producing the maximum pain, embarrassment and humiliation." (Citations omitted.)).

The plaintiff commission notes that the *Harrison* factors are to be "weighed and considered, rather than elements necessary to support a claim for emotional distress damages . . . ." In the present case, the referee explicitly addressed the three *Harrison* factors and engaged in a thorough analysis for each factor. Nevertheless, the plaintiff commission argues that the referee unreasonably departed from these criteria when she considered the relationship between Howard and Cantillon and increased the evidentiary threshold for demonstrating that the discrimination was public in nature. As a result of these alleged deviations, the plaintiff commission claims that the referee committed a "prejudicial error of law." We are not persuaded.

The plaintiff commission first argues that the referee erred by considering the relationship between Howard and Cantillon. Specifically, the plaintiff commission challenges the following passage from the referee's decision found in her analysis of the degree of offensiveness of the discriminatory actions and impact on the complainant: "The present case stands in contrast to several other housing harassment decisions of this tribunal wherein the parties had a legal housing relationship. See *Commission on Human Rights & Opportunities ex rel. Brown* v. *Jackson*, [CHRO Nos. 0750001 and 0750002, 2008 WL 5122193 (November 17, 2008)], and *Commission on Human Rights & Opportunities ex rel. Scott* v. [*Jemison*], CHRO No. 9950020, 2000 WL 35575662 (March 20, 2000) which both involved direct discriminatory harassment of a tenant by a landlord. See also *Commission on Human Rights & Opportunities ex rel. Hartling* v. *Carfi*, [CHRO No. 0550116, 2006 WL 4753467 (October 26, 2006)], which involved direct

discriminatory harassment of a condominium owner by the property manager of the condominium complex. In these three harassment cases, the respondent landlord, or condominium association property manager as the case may be, had the power and authority, and hence far greater ability than the discriminator in the present matter, to interfere with the housing rights and status of the victim or to affect the provision or services or facilities in connection with housing. In the present case, where both parties are resident-owners, the respondent, not being an association board member or property manager of the condominium complex, had no enforcement and supervisory power over the complainant with respect to association rules or the provision or enjoyment of services or common facilities, and lacked an ability to oppress or penalize her by virtue of his authority." (Footnotes omitted.) The plaintiff commission challenges this analysis and argues that it was an error of law for the referee to consider this relationship in her decision.

A review of the referee's decision reveals that she considered the relationship between Howard and Cantillon as neighbors in contrast to harassment cases involving a landlord-tenant relationship. The distinction between the two circumstances is readily apparent. The power dynamic found in harassment cases involving a landlord-tenant relationship is highly relevant because it pertains directly to the emotional reaction of the complainant as well as to the degree of offensiveness and the impact of the conduct on the complainant. As the Superior Court noted in its decision: "If a landlord-tenant relationship existed with the landlord being the discriminating party, the conduct would be more likely to have a more serious effect because the landlord has a position of dominance over the tenant. For example, the landlord is capable of taking actions that others cannot, such as eviction, raising the tenant's rent, or refusing to make repairs, thereby having the potential to engender more fear. If the parties have or had a social relationship, the conduct may be more or less hurtful, depending upon the relationship. Lastly, as further example, if the parties had a relationship of trust or authority, that relationship may affect how the discriminatory conduct is perceived by the complainant." We agree with the court's analysis.

In the present case, Howard and Cantillon were neighbors. The referee concluded, based on the evidence before her, that Howard and Cantillon's relationship did not exhibit a similar power dynamic to that of a landlord-tenant relationship, such that it would increase the degree of offensiveness and impact on Howard. The referee noted that "[Cantillon], not being an association board member or property manager of the condominium complex, had no enforcement and supervisory power over the complainant with respect to association rules or the provision or enjoyment of

services or common facilities, and lacked an ability to oppress or penalize [Howard] by virtue of his authority." Given our deference to the factual findings of the referee, as well as the highly relevant nature of the relationship between a complainant and the party accused of inflicting emotional distress, we conclude that the referee did not act unreasonably by considering the relationship between Howard and Cantillon in the present case.

The plaintiff commission further argues that the referee erred in her determination that the discrimination was not public. Whether the discrimination was public is a question of fact. In her decision, the referee pointed to specific testimony from Howard explaining that Cantillon would harass and direct racial slurs at her " 'especially when there were no witnesses to observe this behavior.' . . . 'If I see him at the mailbox and he's with no one and I'm with no one, he would say "I'm still going to get you, [N-word]," and that was mainly every time that, if his wife is not in the car with him, or no one is with me, that's when he would do it.' " (Citation omitted; emphasis omitted.) On the basis of this testimony and the totality of the evidence before it, the referee concluded: "The complaint allegations, and the testimony of the complainant and her former boyfriend, establish that the respondent's racially hostile epithets and obscene-gesture harassment generally were not visible or readily apparent to other persons. . . . [T]he discriminatory harassment occurred in front of other people only twice." (Citations omitted.)

The plaintiff commission argues that the evidence before the referee established that the harassment occurred "exclusively in the open" and that others were aware of Cantillon's behavior, and, therefore, the evidence establishes that there were more than two instances of "public" discrimination. It is well established that, "[w]ith regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency." (Internal quotation marks omitted.) *Dept. of Public Safety* v. *Freedom of Information Commission*, supra, 298 Conn. 716. Our review of the record leads us to the conclusion that the referee's factual determinations were reasonable given the evidence before her.

The plaintiff commission further argues that the referee's conclusions regarding the public nature of the discrimination contains an error of law. Specifically, the plaintiff commission argues that the referee impermissibly implemented a requirement that more than one person must be present for the discrimination to be public and erred as a matter of law in concluding that the discrimination was not public. We disagree. The plaintiff commission attempts to characterize the referee's factual findings that the discrimination was not public

as a question of law. We conclude that the referee's determination was a factual finding based on the evidence before her and agree that the harassment generally was not visible or apparent to other persons. We will not disturb this factual finding.

The plaintiff commission next argues that the referee added an additional requirement that the discriminatory conduct be intentionally public for the express purpose of inflicting greater pain and distress. Specifically, the plaintiff commission points to the referee's conclusions that "there is no evidence that the respondent aimed his hostile speech and conduct at the complainant in the presence of other listeners with the intent to inflict greater emotional distress" and "[t]he absence in the present case of public humiliation done with the intention and effect of producing the maximum pain, embarrassment and humiliation . . . militates against a higher-end award"; (citation omitted; internal quotation marks omitted); and argues that the referee erred as a matter of law in considering the intentionality of the discrimination as part of its analysis of the public nature of the discriminatory actions. We disagree.

In its decision on appeal, the Superior Court properly analyzed this argument stating: "Discriminatory conduct of this type . . . is always intentional, and the choice to engage in that conduct in public, where the effect is obvious, is also always intentional. The [referee's] quote thus merely recognizes that when a respondent intentionally chooses to publically exhibit discriminatory conduct towards another person, that discriminatory conduct will have the effect of producing the maximum pain, embarrassment and humiliation." The referee, in her discussion of the public nature of the conduct, considered Cantillon's intentions behind the conduct as a means to analyze the circumstances surrounding the harassment and its effect on Howard. We do not agree with the plaintiff commission that the referee was imposing an additional requirement with no basis in law. The ultimate goal of a human rights referee, in determining damages, is to thoughtfully and thoroughly consider the evidence and circumstances pertaining to the misconduct at issue.[3] See *Thames Talent, Ltd.* v. *Commission on Human Rights & Opportunities*, 265 Conn. 127, 136, 827 A.2d 659 (2003) ("[t]his remedial goal is furthered by vesting in a hearing officer *broad discretion* to award . . . appropriate remedies specifically tailored to the particular discriminatory practices at issue" (emphasis added; internal quotation marks omitted)). As the Superior Court correctly stated, "[f]lexibility must be maintained to consider other potentially important evidence that may be relevant in particular cases." Indeed, the plaintiff commission agrees that the *Harrison* factors are not elements that must be met to support a claim for emotional distress damages but are, instead, factors to be weighed and considered among other evidence. We conclude that

the referee acted reasonably in her analysis pertaining to the public nature of the discriminatory conduct and that the Superior Court did not abuse its discretion in dismissing the appeal.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 46a-94a authorizes the Commission on Human Rights and Opportunities (CHRO) to appeal to the Superior Court an adverse decision of a presiding officer. General Statutes § 4-183 requires the CHRO, in such instances, to serve the agency that rendered the final decision. In the present case, the CHRO appealed the decision of its own human rights referee and thus named and served itself as defendant. See *Blinkoff* v. *Commission on Human Rights & Opportunities*, 129 Conn. App. 714, 719, 20 A.3d 1272 ("[w]e recognize that, pursuant to . . . § 46a-94a (a) and in accord with the rules provided in . . . § 4-183, the [CHRO] has the statutory right to appeal from the final decision of its own hearing officer" (footnote omitted)), cert. denied, 302 Conn. 922, 28 A.3d 341 (2011); see also *Commission on Human Rights & Opportunities* v. *Torrington*, 96 Conn. App. 313, 314 n.1, 901 A.2d 46 ("[i]n its administrative appeal, the plaintiff, appealing from the decision of its human rights referee, properly named itself as a defendant"), cert. denied, 280 Conn. 929, 909 A.2d 957 (2006).

The defendant commission represents that it is prevented, however, from advocating for both sides in an appeal under *Quist* v. *Commission on Human Rights & Opportunities*, Court of Common Pleas, Tolland County, Docket No. 5055 (November 10, 1975), because it owes a "continuing obligation to the [complainant] . . . ." See also *Commission on Human Rights & Opportunities* v. *Board of Education*, 270 Conn. 665, 682, 855 A.2d 212 (2004) ("under its statutory regime, the [CHRO], and not the original complainant, carries the laboring oar in investigating, attempting to mediate, presenting, and ultimately administratively adjudicating, a claim of discrimination filed by an individual complainant"). The defendant commission has elected to support the plaintiff commission. The present case thus presents us with the unusual situation of both parties on appeal advocating for the same interests; specifically, asking this court to reverse the decision of the Superior Court, vacate the referee's award of damages and remand the case for a new calculation of damages.

Additionally, neither the complainant, Kelly Howard, nor the respondent, Richard Cantillon, appeared in Superior Court or participated in the appeal. The state of Connecticut has, pursuant to Practice Book § 67-7, filed an amicus curiae brief in the present matter advocating for a position averse to certain arguments of both the plaintiff and the defendant commissions. The state did not participate in oral argument.

[2] In the present case, the plaintiff commission has alleged a violation of § 46a-64c. Damage awards under that statute are issued pursuant to General Statutes § 46a-86 (c), which is silent as to any range or minimum amount of damages that a presiding officer must award on a finding of discriminatory practice and provides only that "the presiding officer shall determine the damage suffered by the complainant, which damage shall include, but not be limited to, the expense incurred by the complainant for obtaining alternate housing or space, storage of goods and effects, moving costs and other costs actually incurred by the complainant as a result of such discriminatory practice and shall allow reasonable attorney's fees and costs. . . ." In the absence of any language in the statute, we cannot conclude that a binding or presumptive range of damages in emotional distress claims is recognized in Connecticut. See *Kobyluck Bros.*, *LLC* v. *Planning & Zoning Commission*, 167 Conn. App. 383, 391, 142 A.3d 1236 ("[a] court must interpret a statute as written . . . and it is to be considered as a whole, with a view toward reconciling its separate parts in order to render a reasonable overall interpretation" (internal quotation marks omitted)), cert. denied, 323 Conn. 935, 151 A.3d 383 (2016).

[3] We note that both the plaintiff commission and the defendant commission have directed us to numerous cases detailing the long history of racial hatred and bigotry associated with the racial epithet used by Cantillon. See *State* v. *Liebenguth*, 336 Conn. 685, 703–704, 250 A.3d 1 (2020), cert. denied, U.S. , 141 S. Ct. 1394, 209 L. Ed. 2d 132 (2021); *Rogers* v. *New Britain*, 189 F. Supp. 3d 345, 356 (D. Conn. 2016); *In re John M.*, 201 Ariz. 424, 428, 36 P.3d 772 (App. 2001).

In her decision, the referee made detailed findings of fact regarding Cantil-

lon's regular use of that racial epithet directed at Howard. In making her damages award, the referee expressly stated: "There is no doubt that the respondent's race-based verbal harassment, obscene gestures, and threatening conduct were highly offensive and inflammatory. The pervasive and persistent use of derogatory racial epithets . . . and race-based threats . . . over a period of seven years is patently offensive and well recognized as such." Accordingly, we conclude that the referee properly considered the weight of this word and its effect. The parties' arguments that we consider the use of that specific word in our analysis of the referee's factual findings does not persuade us to reverse her factual findings.

---